IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| THOMAS JAMES ZAJAC, <br><br> Petitioner, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Respondent. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:12-cv-355 CW <br><br> *Related Case No.* 2:06-cr-00811 CW <br><br> Judge Clark Waddoups |

## INTRODUCTION

Mr. Zajac was convicted for crimes associated with a bombing that occurred at the Salt Lake City library in 2006. This matter is now before the court on Mr. Zajac's Motion to Vacate, Set Aside, or Correct Sentence ("2255 Motion"). Mr. Zajac asserts the cumulative effect of multiple errors denied him a fair trial. He asks for a new trial, that certain evidence be excluded based upon how critical information was mishandled, and that he be appointed counsel both in Salt Lake and Chicago because there are complex issues at play due to Rule 404(b) evidence.

The court held an evidentiary hearing on March 26, 27, and April 1, 2014. Mr. Zajac appeared *pro se*, but had court-appointed standby counsel Elizabeth Hunt and Ronald J. Yengich present on his behalf. Carlos A. Esqueda and Richard D. McKelvie appeared on behalf of the United States. The court heard the testimony of fact witnesses and received into evidence multiple exhibits. In addition, the court has reviewed the parties' extensive briefing on the 2255 Motion, along with relevant portions of trial transcripts, trial exhibits, *Daubert* hearing transcripts, prior court rulings in

the criminal matter, and other information of record in the criminal case.  Based on the evidence presented and the court's review of the case materials, the court concludes that Mr. Zajac has presented a number of troubling issues, but those issues are insufficient under the *Strickland* standard to warrant a new trial.  The court therefore denies Mr. Zajac's 2255 Motion.

## BACKGROUND

At approximately 2:34 p.m. on September 15, 2006, a bomb exploded on the third floor of the Salt Lake City Library.  The bomb was placed by a chair and housed in an Arby's fast food bag before it exploded.  Two weeks earlier, a bomb had exploded at a train station in Hinsdale, Illinois. Thomas James Zajac was tried in 2010 for the Salt Lake City bombing, during which Rule 404(b) evidence was admitted regarding the Hinsdale bombing.

At trial, the United States[1] presented video surveillance of a man entering the library at 2:12 p.m. and exiting at 2:19 p.m.  The man wore a blue-shirt, khaki pants, dark shoes, and carried a black briefcase in his left hand.  The time span was sufficient for a person to enter the library, plant the bomb on the  third floor, and leave the library.  The video quality was insufficient to show conclusively that Mr. Zajac was the man in the video, but Mr. Zajac's former wife and his daughter testified that it was him.

Additionally, the United States presented evidence that Mr. Zajac's fingerprint was found on a piece of cardstock located among bomb and fast food bag remnants.  The cardstock had writing on it consistent with packaging for an Estes model rocket motor and igniter.[2]  Moreover, the cardstock

---

[1] Richard D. McKelvie and Eric G. Benson represented the United States at trial.

[2] The Salt Lake City bomb did not have a model rocket motor.  Also, it may have had a pyrotechnic fuse rather than a model rocket igniter.  Thus, even though the cardstock was from

had a Hobby Lobby price tag on it, showing whatever item had been housed in the packaging was purchased at that store.  At the time of the bombing, no Hobby Lobby store was located in Utah, but there were stores in Illinois.  Thus, that piece of cardstock was transported through interstate commerce and may have been transported from Illinois.

The United States also presented evidence of cell phone tower data to support that Mr. Zajac traveled from his place of residence in Illinois to Utah near the time of the bombing.  Additionally, it presented a credit card receipt from at a fuel station in Park City to show Mr. Zajac was in Utah on the day of the bombing.  The United States further presented evidence to show a threat letter associated with the Salt Lake bombing was mailed from Nebraska at a time near Mr. Zajac's travel to Nebraska.  Finally, the United States presented evidence that another bombing in Illinois was consistent with the Salt Lake City bombing.  Evidence found in Mr. Zajac's apartment and a second threat letter further supported the connection between the two bombings.

During opening statements, defense counsel Deirdre A. Gorman stated the defense would put on evidence of witnesses who saw a person sitting in the relevant chair before the bombing.  Most significantly, Patricia Gallagher saw a young man[3] sitting in the chair moments before the bomb exploded and that he left a white fast food bag by it.  Although there were actual witness accounts, the defense rested without putting on any of them.  Instead, during the United States' case in chief, co-defense counsel, Edwin S. Wall, focused on the defense theory that Mr. Zajac's son, Adam, had

---

packaging for a Estes model rocket motor and igniter, it is not clear that the cardstock had anything to do with the bomb components.

[3] Mr. Zajac was fifty-three at the time of the bombing and therefore did not meet the description.

committed the crime.[4]  Adam, he argued, had motive to be angry at the police and to be upset at how

Mr. Zajac had treated Adam's wife.  Additionally, he allegedly had access to Mr. Zajac's apartment

where he could have obtained the cardstock to plant it at the scene of the bomb.

The jury rejected the defense theory and found Mr. Zajac guilty for crimes associated with the

bombing and the threat letters.  Mr. Zajac appealed, but only on two grounds: that the four-year delay

between his indictment and the trial violated the Sixth Amendment and the Speedy Trial Act.  The

Tenth Circuit Court of Appeals affirmed his convictions.

## ANALYSIS

### I.      STANDARD OF REVIEW

Mr. Zajac is proceeding *pro se*, with standby counsel.  Thus, his claims are construed liberally.

*Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008) (citation omitted).  Nevertheless, Mr. Zajac

has the burden to "allege sufficient facts on which a recognized legal claim can be based."  *Kidwell*

*v. Martin*, 480 Fed. Appx. 929, 934 (10th Cir. 2012) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110

(10th Cir. 1991)).  Allegations that are speculative, vague, or conclusory are insufficient to satisfy the

*Strickland* standard.  *Id.* (citation omitted).

Mr. Zajac's § 2255 Motion pertains to a complex criminal case that was developed over the

course of four years.  His 2255 Motion is no less complex.  Mr. Zajac asserts the following four

grounds for relief: (1) prosecutorial misconduct; (2) mishandling of the evidence; (3) failure to prove

each element of the crime, and (4) ineffective assistance of counsel.  Under each ground, he alleges

numerous sub-grounds for relief.

---

    [4]  Although Ms. Gorman was lead counsel, Mr. Wall handled most of the trial due to his
scientific education and training.

A.      **Standard to Overcome Procedural Bar**

Before the § 2255 Hearing, the United States asserted that the first three grounds for relief are procedurally barred because the issues should have been raised on direct appeal.  The United States concedes any issues raised from an ineffective assistance of counsel perspective, such as failing to object to prosecutorial misconduct, may be analyzed under a § 2255 motion.  It opposes, however, evaluating the first three grounds separate and apart from Mr. Zajac's ineffective assistance of counsel claims.

"A § 2255 petition is not an opportunity to bring legal arguments that should have been brought by direct appeal." *United States v. Torres-Laranega*, 473 Fed. Appx. 839, 842 (10th Cir. 2012) (citing *United States v. Frady*, 456 U.S. 152, 165 (1982)).  Hence, if "a defendant fails to raise an issue on direct appeal, he is barred from raising the issue in a § 2255 proceeding, unless he establishes either cause excusing the procedural default and prejudice resulting from the error or a fundamental miscarriage of justice if the claim is not considered."[5]  *Id.* (quotations and citation omitted).

"To establish 'cause' requires a defendant to show some external objective factor   such as governmental interference, unavailability of the relevant factual or legal basis, or ineffective assistance of counsel   prevented him from raising the issue on direct appeal." *Id.* (citation omitted).  Here, Mr. Zajac contends he raised each of the grounds with his attorneys, but they did not pursue them in post-trial motions or on appeal.  Memo. in Supp. of Mot., at 194 (Dkt. No. 2 in Case No. 2:12-cv-355).  Therefore, he has asserted "cause" for why the issues were not raised on direct appeal.

_____

[5]  "The fundamental miscarriage of justice exception allows a defendant to obtain review of his defaulted claims by showing actual innocence." *Torres-Laranega*, 473 Fed. Appx. at 842 (citation omitted).  Mr. Zajac has failed to show actual innocence.  Accordingly, the court does not analyze the evidence under that prong.

Mr. Zajac must still show, however, that the failure to raise the issues resulted in prejudice. To show prejudice, Mr. Zajac must show that the deficiency "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170.

### B.      Standard to Show Ineffective Assistance of Counsel

When evaluating an ineffective assistance of counsel claim, " a strong presumption [exists] that counsel's conduct falls within the wide range of reasonable professional assistance," and that counsel's actions constituted "sound trial strategy.'" *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (quotations and citation omitted). To overcome this presumption, Mr. Zajac "must show both that (1) counsel's performance was deficient; and (2) the deficient performance prejudiced him." *United States v. Hargrove*, 558 Fed. Appx. 807, 809 (10th Cir. 2014) (quotations and citations omitted). Prejudice is shown when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 809 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)) (other citation omitted). A court "need not analyze both the performance and prejudice prongs of the *Strickland* test if [the petitioner] fails to make a sufficient showing of one." *Id.* (quotations and citation omitted).

To address whether Mr. Zajac has met the standards stated above, the court will first look at each ground and sub-grounds Mr. Zajac has raised. Then it will review the cumulative effect of the alleged errors.

## II.      ALLEGED GROUNDS OF MISCONDUCT

### A.      Prosecutorial Misconduct

Mr. Zajac alleges the following twenty-six grounds of prosecutorial misconduct.

1.      *Library Video Surveillance*

Mr. Zajac alleges that of the 31 video surveillance areas in the library, the prosecution withheld 13 areas that showed footage of the garage and potential exculpatory information.[6]  Mr. Zajac is correct that he was not provided with footage for 13 cameras.  During the trial, the issue of missing video footage was raised and the court asked the United States to check on "what images still remain and whether they have been produced."  Trial Tr., at 347 (Dkt. No. 549 in Case No. 2:06-cr-811).  It never received a report back from the United States and defense counsel failed to press the issue further.  Special Agent Michael Minichino explained during the § 2255 Hearing that he assumed all video had been captured and had only recently learned it had not been when preparing for the § 2255 Hearing.  In other words, the government did not withhold evidence from the 13 cameras, it simply never confirmed it actually had all footage from the library at the time of the bombing.  Mr. Zajac asserts the agent is not being truthful about what happened with the footage.

It is troubling that footage from 13 cameras on the day of the bombing was not gathered.  The government also produced footage from September 11, 2006 through September 14, 2006,[7] but it, too, did not contain any video from the garage.  Thus, the information is irretrievably lost.  The court has insufficient information, however, to conclude the government actually had the footage and

---

[6]  Potentially the cameras may have shown that Mr. Zajac's vehicle was not in the parking garage.

[7]  *See* Report of Investigation, No. 23, at Bates No. 463 (Dkt. No. 4, Part 2 in Case No. 2:12-cv-355).

intentionally chose not to disclose it because it had exculpatory information on it.

2. *Fingerprint Individualization*

Mr. Zajac asserts Mr. McKelvie violated the court's order regarding a finger print found on the piece of cardstock located among bomb and fast food bag remnants. The court precluded experts from testifying that the fingerprint was Mr. Zajac's to the exclusion of all others. During closing argument, however, the Mr. McKelvie stated the fingerprint expert "talked about all of those individual items, those characteristics that are   are characteristic of one *and not any other*." Trial Tr., at 1415 (Dkt. No. 547 in Case No. 2:06-cr-811) (emphasis added). It was improper for counsel to argue that the expert said the characteristics applied to only one person and not any other. While counsel may have argued the jury should find the fingerprint was Mr. Zajac's, it was improper to argue that the characteristics applied to one person only and not any other given the court's ruling. The reference was minimal, however, when viewed in context of the entire closing argument about the fingerprint.

3. *Fingerprint Location*

Mr. Zajac asserts the United States incorrectly argued that Mr. Zajac's fingerprint was found on the bomb. During closing arguments, Mr. McKelvie did indicate that a fingerprint was found on the bomb. Trial Tr., at 1437 (Dkt. No. 547). The fingerprint was found among the bomb remnants, but not on the bomb itself. Therefore, the statement was inaccurate.

4. *Tainted Evidence*

Mr. Zajac asserts that Special Agent Minichino and another agent tainted fingerprint and DNA evidence found on the bomb's timer. It is correct that the quality of fingerprint evidence on the timer was not good, but Mr. Zajac has presented insufficient evidence to show that it was due to mishandling of the evidence. With respect to the DNA evidence, when the fingerprints were dusted

and lifted from the timer, the remaining evidence was so minimal that no DNA analysis could be done of it. This is also troubling due to the potential for exculpatory evidence. There is no evidence before the court, however, that the government had the deliberate intent to destroy the evidence.

Mr. Zajac also asserts the government planted the cardstock evidence in an evidence bag and that the cardstock was not present earlier. At the § 2255 Hearing, the United States presented photographs of the crime scene that clearly show the cardstock was among the bomb remnants. Mr. Zajac's former counsel testified he was provided those photographs during discovery and knew the cardstock had appeared in them. Thus, the United States effectively rebutted Mr. Zajac's assertion that the cardstock was planted at a later date.

5.    *Media Witnesses*

Mr. Zajac asserts the United States misrepresented during closing argument the testimony of two media witnesses in an effort to bolster that he was at the library on the day of the bombing. He asserts the witnesses never testified he was at the library the day of the bombing. The trial transcript shows one witness testified that Mr. Zajac told him during an interview after the bombing "he was either at the library on the day of the bombing or on either the day before or after the bombing." Trial Tr., at 721 (Dkt. No. 542). The other media witness testified Mr. Zajac told him he "did not believe that he had been in the library on the day" of the bombing. *Id.* at 729. During closing argument, Mr. McKelvie said Mr. Zajac told two news reporters "that he was in the library that day." Trial. Tr., at 1430 (Dkt. No. 547). The government, therefore, overstated this evidence.

6.    *Witness Identification*

Mr. Zajac asserts an Alcohol, Tobacco, and Firearms ("ATF") agent met privately with his daughter and former wife to show them footage of the library and have them identify Mr. Zajac. Mr. Zajac asserts that defense counsel was not informed about this identification process and had no

opportunity to attend it, thus, violating his rights.  Prior to the § 2255 Hearing, the court dismissed

this ground because the government's actions were permissible based on *United States v. Ash*, 413

U.S. 300, 321 (1973).  *See* Order, at 3  4 (Dkt. No. 43 in Case No. 2:12-cv-355).

### 7.    *Items of Identification*

Mr. Zajac asserts the United States made improper closing argument regarding identification

of his clothing, which prejudiced him.  During trial, Mr. Zajac's former wife, Sharon, was asked if

she recognized the blue-shirted man in a library video clip.  She responded "[t]hat would be Tom."

Trial Tr., at 864 (Dkt. No. 550).  She could tell based on several aspect, including his attire.  *Id.*

Likewise, Mr. Zajac's daughter, Allison, was asked if she recognized a man in a library video clip.

She responded "It's my dad."  *Id.* at 851.  She could tell by the way he walked, his shoes, and his

briefcase in his left hand.  *Id.*  She did not mention the man's khaki pants, but during closing

argument, the United States asserted she did.  Trial Tr., at 1435 (Dkt. No. 547).  This was incorrect.

It does not negate the fact, however, that Mr. Zajac's daughter and former wife both positively

identified him based on what they saw in the video.

### 8.    *Briefcases*

Mr. Zajac asserts the government deliberately broke the chain of custody regarding two

briefcases found in his apartment to eliminate exculpatory evidence.[8]  During the § 2255 Hearing,

Special Agent Minichino testified the United States Attorney's Office in Chicago ordered that the

items be given to Mr. Zajac's sister.  They were returned on November 27, 2006.  Report of

Investigation, No. 19, at Bates No. 784 (Dkt. No. 4, Part 2 in Case No. 2:12-cv-355).  Special Agent

---

[8]  Mr. Zajac's sister testified at the § 2255 Hearing the briefcases that were returned to her
were smaller than the one carried by the blue-shirted man in the video clip.  Had the government not
spoliated this piece of evidence, the briefcases could have been shown to the jury for a comparative
analysis.  Additionally, the briefcases could have been tested for trace evidence of explosives.

Minichino stated the order was unusual and he disagreed with it, but it was out of his control to stop it.  Again, this presents a troubling issue because, at trial, the United States relied upon video footage of a man carrying a black briefcase to prove that Mr. Zajac was at the library on the day of the bombing.  No reasonable explanation has been provided about why these items were returned early in the case.[9]

        9.      *Threat Letter Comparison*

Mr. Zajac asserts the United States violated a court order when counsel engaged in a comparative analysis of language from separate threat letters.  The court precluded the government's authorial attribution expert from testifying that the letters were written by the same person.  The court's order pertained to expert testimony.  It did not preclude counsel from arguing that there were similarities between the two letters and why they should both be attributed to Mr. Zajac.  Because the letters had been admitted into evidence, it was permissible to draw reasonable inferences from that evidence.  Mr. McKelvie did that.  Accordingly, the United States did not violate the court's order.

        10.     *Envelope*

Mr. Zajac asserts the government deliberately broke the chain of custody regarding an envelope, with labeling, found in his apartment.  Because two threat letters were at issue during the trial, the nature of the envelope and how it was labeled had potentially relevant information.  Special

---

[9] Special Agent Minichino testified he did not know of the briefcases' evidentiary value until after they were returned.  Yet, a report that pre-dated the return of the items contained a witness statement about a "white male wearing a green polo shirt and tan khaki pants . . . approximately 5'10" and having a "belly", approximately 30 to 50 years old, and with dark hair. . . . [Witness] believed the UM to be in possession of a *black brief case*."  Rpt. of Investigation (Oct. 2, 2006), at Bates No. 139 (Dkt. No. 4, Part 2 in Case No. 2:12-cv-355) (emphasis added).  The witness's identification was later used in the Complaint filed on October 27, 2006.  Complaint, ¶ 11 (Dkt. No. 1 in Case No. 2:06-cr-811).  Consequently, the fact that a black briefcase may have been at issue was known before the briefcases from Mr. Zajac's apartment were returned to his sister.

Agent Minichino testified at the § 2255 Hearing that the envelope was returned to Mr. Zajac's sister at the same time as the briefcases.

More information about how the envelope was handled is in the documentary evidence provided by Mr. Zajac. Tina A. Sherrow, Special Agent in Downers Grove, Illinois, also was involved in the bombing investigations. *See* Reports of Investigation, at Bates No. 146  48 (Dkt. No. 4, Part 2 in Case No. 2:12-cv-355). On November 6, 2006 she sent an e-mail to William F. Hyatt Sr., and copied Jane E. Balkema, another ATF Special Agent. The e-mail stated,

> Would you please return item 42 to us as soon as is practically possible? It is a legal size envelope with a label on it. We will not need that item to be compared to anything and need it returned so that we can return it to the owner.

E-mail, at Bates No. 1954 (Dkt. No. 4, Part 2 in Case No. 2:12-cv-355). On a property status summary report completed by Special Agent Balkema, Item 42 is listed as "envelope bearing machine printed address label." Property Status Summary Rpt., at Bates No. 255 (Dkt. No. 4, Part 2); *see also* Laboratory Rpt., at Bates No. 899 (Dkt. No. 4, Part 2).

The record does not reflect who Mr. Hyatt was, but it does show that ATF reported the item was not needed. Yet, at the time of the e-mail, two threat letters had already been received. Moreover, at trial, the United States used pictures of the envelope, *see* Gov't Exs. 59 and 64, to connect Mr. Zajac to the threat letters. Consequently, the United States has failed to provide any reasonable explanation about why this piece of evidence was returned early in the case.

### 11.  *Label Printer*

Mr. Zajac asserts the government withheld exculpatory information about a label printer in his apartment. The label printer had a ribbon that potentially recorded characters. Specifically, the affidavit for a search warrant said "[t]he ribbon may retain an imprint of addresses previously printed

by the label writer." *Id.* It was seized so a search could be conducted of it, but a report about the ribbon was never produced. *See* Application & Affidavit for Search Warrant, at 1178, ¶ 17 (Dkt. No. 4, Part 3). Nevertheless, during closing argument, the United States argued that the label printer was used to produce the labels on the threat letters. Mr. Zajac contends the report was never produced because it contained exculpatory information showing the label printer never made the labels at issue. The government did not address this allegation at the § 2255 hearing. Thus, the court has no information about whether a search of the ribbon, itself, was ever done.

To accept Mr. Zajac's argument, however, the court would have to conclude the ribbon did retain characters, that the ribbon recorded characters dating back to the time of the threat letters, and that the government hid information it recovered. Mr. Zajac has presented insufficient evidence to support such a conclusion. In contrast, the record does show the label-printer's ink was chemically analyzed and found to be indistinguishable from the ink on the label of the Hinsdale threat letter. Secret Service Lab Report, at Bates No. 6800 (Dkt. No. 4, Part 2). Thus, the United States could properly argue that the label printer was used to produce the label on the threat letter.[10]

           12.    *Location of Gunpowder*

Mr. Zajac asserts the United States mischaracterized expert testimony during closing argument about gunpowder evidence. Trace evidence at the Salt Lake City bomb scene included double-base smokeless powder, with fragments of blue identifier that were consistent with Alliant Blue Dot powder. Similar gunpowder also was found at the Hinsdale bombing. In Mr. Zajac's apartment, however, no blue identifiers were found. The apartment complex had storage units on the

---

[10] The label on the Salt Lake City letter could not be chemically analyzed due to other testing that had been done. The United States invited the jury to look at the fonts on the box of the label printer and compare it themselves. This is permissible because the item had been received into evidence.

underground level.  One blue disc was found in a shop vac in Mr. Zajac's storage unit.[11]

At trial, the United States' expert initially testified the gunpowder in Mr. Zajac's apartment was consistent with Alliant Blue Dot powder.  During cross examination, she testified that only the *gray* disks in the shop vac were visually consistent with those found in the apartment.  Trial Tr., at 1127 (Dkt. No. 546).  She did not otherwise test the gunpowder found on items in the apartment, and she admitted that visually, she could "reach no conclusion that it was Blue Dot double-base smokeless powder."  *Id.* at 1127, 1131.

During closing argument, however, Mr. McKelvie argued that Alliant Blue Dot "powder was found in different locations in Mr. Zajac's home, including the shop vac, hall closet, funnels, pliers, and other locations."  Trial Tr., at 1433 34 (Dkt. No. 547).  Based on the expert's testimony during cross-examination, the representation was only accurate with respect to the shop vac located in the underground storage unit.

13. *Ammunition*

Mr. Zajac asserts two additional issues with respect to gunpowder and ammunition.  First, the government destroyed a 16-gauge shotgun shell that was found in Mr. Zajac's apartment, without leave of court, and without taking photographs or other measurements.  He contends it was destroyed because it contained no blue dot powder and the government wanted to hide that information.  Given that the United States' expert admitted no blue dot powder was found in the apartment, itself, destroying the shotgun shell did not destroy exculpatory evidence.

Second, during closing argument, Mr. McKelvie represented that no ammunition was found in Mr. Zajac's apartment; consequently, there was no legitimate reason that gunpowder was found

---

[11]  No testing was done on the blue disk due to its small quantity.

there.  Trial Tr., at 1434 (Dkt. No. 547).  Again, this was an inaccurate statement because multiple rounds of various types of ammunition were found in the apartment.

              14.    *Model Rocket Engine*

Mr. Zajac asserts the United States misrepresented during opening statements that a model rocket engine was found at the Salt Lake bombing scene.  Mr. Benson did make that statement, *see* Trial Tr., at 211 (Dkt. No. 549), even though a model rocket motor was found only at the Hinsdale bombing.  The opening statement was therefore incorrect.

              15.    *Bomb Mock-up*

Mr. Zajac asserts the United States attempted to terrorize the jury by displaying a full mock-up model of the bomb just after testifying the Salt Lake bomb was "capable of personal injury or death." Trial Tr., at 1189 (Dkt. No. 546).  The mock up was in a bag like the Salt Lake City bomb.  When the United States attempted to lay foundation about the mock-up bomb, it stated it was "inert." *Id.* at 1190.  Then it stated, "Your Honor, . . . *we anticipate asking this witness to show a device* for demonstrative purposes only." *Id.* (emphasis added).  Before it was shown to the jury, defense counsel viewed the device and was again told it was inert. *Id.* at 1190  91.

The United States' witness then stated, "I see people starting to squirm.  There is no   this is a demonstrative exhibit.  It contains the pieces and parts . . . but there is no explosive in this device, so there is no danger that anyone needs to scramble, duck, or die.  I also have not connected the rocket motor because I would say with the battery in it, it is a live circuit and it will fire the rocket." *Id.* at 1191.  The witness then clarified he meant rocket igniter rather than rocket motor. *Id.* Ultimately, the court excluded the exhibit and it was never shown to the jury. *Id.* at 1194.

Because the jury was never shown the mock-up and the witness explained in detail that the mock-up was harmless, no error occurred on this issue.

16.    *Timer*

Mr. Zajac asserts the United States misrepresented the bomb components and timer evidence to connect the Salt Lake bomb to the Hinsdale bombs. During closing argument, the United States said, "[y]ou heard the testimony of both of those bomb experts who indicated that a timer in a pipe bomb was rather unusual, something that they hadn't seen on very many occasions." Trial Tr., at 1412 (Dkt. No. 547). Yet, the actual testimony of one of the bomb experts was "the timer is very common amongst a lot of different devices." Trial Tr., at 1186 (Dkt. No. 546). The expert also testified it was very common *how* the timer was used in the device. *Id.* at 1187. The United States, therefore, incorrectly stated the evidence about the timer.

17.    *Tools*

Mr. Zajac asserts the United States misrepresented the connection between the tools in his apartment and the toolmarks on the bomb components. Prior to trial, an ATF analyst concluded the tools in Mr. Zajac's apartment did not match the *distinct* toolmarks on the bomb components. Laboratory Report re Hinsdale, at Bates No. 2217 19 (Dkt. No. 4, part 2 in Case No. 2:12-cv-355). Other toolmarks lacked sufficient definition to either include *or* exclude the remaining tools. *Id.* at 2218 19, 2265 66, 4342 43. During closing argument, Mr. McKelvie argued tools were found in Mr. Zajac's apartment. Trial Tr., at 1433 (Dkt. No. 547 in Case No. 2:06-cr-811). He did not match up specific tools to toolmarks on the bomb components. Because some tools were neither included nor excluded, it was permissible for Mr. McKelvie to argue that tools were found in Mr. Zajac's apartment.

18.    *Computers*

Mr. Zajac asserts the United States misstated the evidence about his personal computers during closing arguments. Three computers were seized and searched. The search showed "[t]here

were no specific references found concerning either the making or construction of a [sic] explosive device . . . nor was there information found on the internet as it relates to the above subjects." Investigative Report, at Bates No. 953 (Dkt. No. 4, part 2 in Case No. 2:12-cv-355). Additionally, none of them "contained any information concerning . . . the specific locations in this investigation." *Id.*

During closing argument, Mr. McKelvie argued the threat letters showed the bomber lived out-of-state because it said he *read* Channel 5 news as opposed to watching it, and that the internet is used to read the news. Trial Tr., at 1420 (Dkt. No. 547). He also argued that the address for the Salt Lake City threat letter was misaddressed because it was something pulled off the internet. *Id.* at 1423. Although forensic evidence about the Salt Lake library was not found on Mr. Zajac's computer, these were nevertheless permissible inferences one can draw from the threat letter.

### 19.   *Alligator Clips*

Mr. Zajac asserts the United States elicited testimony it knew was false regarding electrical alligator clips. Alligator clips were recovered at both bomb sites and also at Mr. Zajac's apartment. The United States' expert testified that she examined alligator clips from the Hinsdale bombing, noted their characteristics, and measured their sizes. Trial Tr., at 949 (Dkt. No. 550). She also testified she examined an alligator clip from the Salt Lake bombing and found it visually consistent with the clips in the Hinsdale bombing. *Id.* at. 965. Next, she testified she examined the alligator clips from Mr. Zajac's apartment and found them visually consistent with those from the bomb scenes. *Id.* at 977. On cross-examination, defense counsel elicited testimony that the alligator clips from the apartment were smaller by 1/8 of an inch and the rubber covers were visually inconsistent with the alligator clip found at the Salt Lake bomb scene. Trial Tr., at 1035 36, 1155 56 (Dkt. No. 546). Thus, any misstatements by the expert were corrected during cross examination.

20.    *Vehicle Search*

Mr. Zajac asserts the government improperly searched his vehicle in Nebraska.  At the § 2255 Hearing, the evidence showed no search was done in Nebraska because Mr. Zajac was not even a suspect at the time he was there.  Although Mr. Zajac opposed the alleged search in Nebraska, he asserts his car should have been searched in Illinois.  Because no search for trace evidence was done, Mr. Zajac contends it was improper for the United States to assert he transported a bomb through interstate commerce.  The government was not required to test Mr. Zajac's car for trace evidence of explosives.  Moreover, it was permissible for it to draw an inference that he transported the explosive material from Illinois to Utah based on the evidence pertaining to Mr. Zajac's travels and the fact that a Hobby Lobby sticker was found among the bomb remnants when no such store was located in Utah.

21.    *Domestic Abuse Charges*

Mr. Zajac asserts the government violated a Rule 404(b) order when it referred to domestic abuse charges in its opening statement and closing argument.  The court's order allowed the prosecution to refer to Mr. Zajac's conduct towards the police at the police station, but not his conduct towards his wife.  *See* Order at 4  5, 17 (Dkt. No. 399).  In their opening and closing remarks, Mr. Benson and Mr. McKelvie referred to Mr. Zajac's arrest at the police station.  Because Mr. Zajac was arrested for hitting his wife and not his hostility towards the police, he contends the United States violated the order.  Moreover, Mr. Zajac contends it left an improper impression that he was arrested due to his hostility towards the police, which was prejudicial in light of the threat letters.  The court agrees that counsel created an improper inference about why Mr. Zajac was arrested and that the inference was prejudicial.[12]

---

[12]  The court means "prejudicial" according to the basic meaning of the word and not as it is used in *Strickland* where the prejudice would vary the outcome of the case.

22.     *Battery Markings*

Mr. Zajac asserts the United States misstated the evidence regarding 9-volt batteries. The Salt Lake City and Hinsdale bombs both used 9-volt alkaline batteries. Special Agent Howard Marcus testified that two 9-volt batteries were found at Mr. Zajac's apartment. Some of the markings on the batteries had been removed and there were traces of adhesive or caulk on them. Trial Tr., at 636 (Dkt. No. 542). During Closing Argument, Mr. McKelvie asked "how common do you suppose it is to find a 9-volt battery with the identifying marks, the lot number and stuff like that scrapped off, and adhesive on the bottom of the battery. The same type of configuration that was found in both of the Hinsdale bomb and the Salt Lake bomb." Trial Tr., at 1434 (Dkt. No. 547).

Although markings were removed, there is no evidence that the markings were identifying marks and the lot number. Instead, it was the "warning" label that was scratched off. Handwritten Lab Notes, Pl's Ex. 22 (Case No. 2:12-cv-355). Moreover, the United States has not pointed the court to any testimony that the batteries used in the bombs had identifying marks removed. Thus, Mr. McKelvie overstated the evidence during his closing argument.

23.     *Battery Type*

Mr. Zajac further asserts the government misrepresented the type of batteries found in his apartment. The batteries found at Mr. Zajac's apartment were heavy duty 9-volt batteries. The batteries at the bomb scene were alkaline 9-volt batteries. The handwritten notes of the United States' expert initially said the batteries from Mr. Zajac's apartment were "Walgreens Heavy Duty Powercell 9v batteries." Handwritten Notes, at Bates No. 4636 (Dkt. No. 4, Part 3 in Case No. 2:12-cv-355). She later changed it to "Walgreens Heavy Duty Powercell 9v alkaline batteries" for her official report. Report, at Bates No. 906 (Dkt. No. 4, Part 2).

For purposes of this motion, the court takes judicial notice of the fact that heavy duty batteries

and alkaline batteries are two different types of batteries, with different chemistry.  Government's

Exhibit 58 shows that the batteries from Mr. Zajac's apartment were heavy duty and not alkaline.

Thus, they were not the same type of battery found at the bomb scenes.

      The batteries at Mr. Zajac's apartment still had significance due to the adhesive or caulk on

the bottom of them.  The jury could reasonably infer that Mr. Zajac experimented with different types

of batteries before he found one that could power a bomb.  It was improper, however, for the United

States to imply the batteries at the apartment were the same as the batteries found at the bomb scenes.

      24.    *UPS Store Surveillance*

      Mr. Zajac asserts the government withheld exculpatory surveillance video from a U.S. Mail

service center.  The Hinsdale threat letter was mailed from a UPS store.  Although the store did not

have video surveillance, another store did.  An officer from the Hinsdale Police Department wrote

in his report that he had the loss prevention agent from the other store

> burn me copies of the exterior cameras of the entire lot so we could
> view them at a later date.  We focused on the cameras located near the
> entrance to the UPS Store.  I took possession of the videos from [the
> loss prevention agent] and brought them to the station.  I logged them
> into evidence.

Hinsdale Police Report, at Bates No. 1262 63 (Dkt. No. 4, Part 3 in Case No. 2:12-cv-355).  Mr.

Zajac contends the video would have shown he never entered the UPS store to mail the letter, but the

government never produced the exculpatory evidence.

      During the § 2255 Hearing, Special Agent Minichino testified he had a supplemental report

from the Hinsdale officer dated three years after the initial report.  The supplemental report was

created after defense counsel asked for the videos to be produced.  It was not provided to the court

at the § 2255 Hearing.  Instead, Special Agent Minichino testified about what it said, but the

testimony was not entirely clear.  At one point, he testified the officer "assumed that ATF . . . was

going to take custody of this aforementioned surveillance when in reality his report says that he took custody of it and then booked it." Hearing Tr., at 318 (Dkt. No. 63). Next, he said "[t]he videos were misplaced and did not make it to the ATF." *Id.* Then, he said "these reports indicate . . . that surveillance was never booked into Hinsdale PD evidence and it was never booked into ATF evidence." *Id.* at 318 19. On cross, he testified, "[t]hey didn't receive a copy. The footage stayed at the store." *Id.* at 350. While it is not clear exactly what happened to the video, what is clear is that this piece of potentially exculpatory evidence was also mishandled by the government.

> 25. *Elements*

Mr. Zajac asserts the United States improperly argued the meaning of the elements for Count II. Count I charged Mr. Zajac with attempting to or actually damaging or destroying a building by means of an explosive device. Count II charged Mr. Zajac with using or carrying a destructive device during and in relation to a crime of violence. During closing argument, Mr. McKelvie remarked that sometimes the two crimes are "a lot different," but "in this particular instance this really is the same as Count I." Trial Tr., at 1407 (Dkt. No. 547). Mr. Zajac contends this nullified the requirement that the jury evaluate each of the elements for the two separate crimes. The court disagrees. Mr. McKelvie properly noted the same explosive device could satisfy elements in both counts. Moreover, in Jury Instruction Nos. 32 through 39, the jury was instructed in detail about the separate elements of the two crimes and how each element had to be met.

> 26. *Cardboard*

Mr. Zajac's final assertion of prosecutorial misconduct is that the United States allowed its expert to provide false testimony about the cardboard in the Hinsdale bombing. The cardboard formed the base to which the bomb was attached. Government's Exhibit 121 showed a top view of the cardboard and that its cut lines appeared to match a cut out from a legal pad found at Mr. Zajac's

apartment.  The side view of the cardboard was not depicted in the exhibit.

The United States' expert testified she did not measure the actual thickness of the cardboard from the bomb scene.  Mr. Zajac contends her lab notes reflect otherwise.  In her lab notes, the expert states "cardboard in Hins. was soaked w/ water, altering its original thickness."  Handwritten Notes, at Bates No. 4646 (Dkt. No. 4, Part 3 in Case No. 2:12-cv-355).   She also notes "the cardboard in SLC seems to be of a different size than that in the search warrant & Hins. device."  *Id.*  Mr. Zajac contends this shows she committed perjury and that had the side view been shown it would have discredited the match between the Hinsdale bomb cardboard and the legal pad cardboard.

One can make a visual observation of the size differences without actually taking measurements.  Moreover, even if the side view showed the Hinsdale bomb cardboard was a different thickness than that on the legal pad, such differences reasonably could be explained due to the water damage.

### B.    Mishandling the Evidence

Mr. Zajac's second ground for seeking a new trial asserts the United States mishandled evidence.  He lists the following six instances: (1) mishandling the library surveillance video; (2) planting the Salt Lake fingerprint; (3) improperly meeting with his daughter and former wife to identify him at the library; (4) mishandling the briefcases found at his apartment; (5) mishandling the envelope found at his apartment; and (6) destroying the 16-gauge shotgun shell.

The court has addressed each of these issues above and concluded that items 1, 4 and 5 were mishandled.

### C.    Failure to Prove Each Element of the Counts

Mr. Zajac's third ground for relief is based on his assertion that the United States failed to prove each element of the crimes charged.  The court will address this ground in Section III.B. below.

**D.**     **Ineffective Assistance of Counsel**

Mr. Zajac asserts eleven bases for ineffective assistance of counsel.  While some reflect the items discussed above, others are unique to this category.

        1.     *Other Library Video Evidence and Witness Accounts*

        a.     <u>Other Library Video Evidence</u>

Mr. Zajac asserts his counsel failed to present readily available video and witness accounts.  As stated above, a blue-shirted man was seen entering the library at 2:12 p.m. and exiting at 2:19 p.m.  Additional footage of the man is seen near the library's downstairs bathroom at 2:14 p.m.  *See* Pl's Ex. 1 (Case No. 2:12-cv-355).  Mr. Zajac contends his counsel should have shown that footage to the jury to prove the blue-shirted man did not have enough time to enter the library, go down to the basement, then up to the 3rd floor to plant the bomb, and exit the building seven minutes after entering it.

Mr. Wall testified at the § 2255 Hearing that he was aware of the footage of the blue-shirted man near the basement bathroom.  He did not present that evidence for three reasons.  First, the bathroom provided a good location to arm a bomb due to its layout and he did not want that known.  Second, the bathroom was located by a children's area.  Had it been shown that Mr. Zajac carried a bomb in the children's area, Mr. Wall was concerned about enhanced penalties.  Third, counsel's investigator walked the route of the blue-shirted man.  He found that he could complete the route within the seven minute time frame.  This is plausible because only two minutes elapsed between the time the blue-shirted man entered the library and when he appears to be leaving the children's area.  That left five minutes to travel to the third floor to leave the bomb and then exit the building.  Mr. Wall has therefore provided a reasonable explanation as to why this evidence was not presented.

b.  Witness Accounts

With respect to the witness accounts, there were several witnesses who testified about different men who sat in or by the relevant chair on the 3rd Floor of the library close to the time of the bombing.  One statement was from Patricia Gallagher.  She entered the area a minute or two before the bomb exploded and wanted to sit in the relevant chair.  She saw, however, a young man (mid-twenties to early thirties with brown hair) sitting there.  When he left, she did not want to sit in the chair because he had left a fast food bag by it.  *See* Pl's Ex. 20 (Case No. 2:12-cv-355).

Mr. Wall testified at the § 2255 Hearing that he "didn't talk to Patti Gallagher at all during the trial or otherwise," and that he had no knowledge whether she had been subpoenaed to testify by his co-counsel.  Hearing Tr., at 474 (Dkt. No. 64).  He stated that he did not call her as a witness "[b]ecause it was inconsistent with the theory of the defense."  *Id.*

Mr. Wall presented a theory during the United States' case-in-chief that Mr. Zajac's son, Adam, had committed the crime.  Adam had been arrested falsely in Hinsdale, Illinois.  He also had been arrested in Salt Lake City for a DUI even though his doctor had cleared him to drive following a medical procedure.  Adam was humiliated by the experiences and had motive to be angry at the police.  Moreover, there was a substantial conflict between Mr. Zajac and Adam's wife that resulted in the couple moving out of Mr. Zajac's home even though they had little money.  Adam was angry at his father over the incident and bottled things up.  Additionally, Adam had access to Mr. Zajac's apartment where he could have obtained the cardstock to plant it at the scene of the bomb.

During opening statement, Ms. Gorman told the jury about Ms. Gallagher.  Mr. Wall admits he did not work with Ms. Gorman on the opening statement and was unaware what evidence she said the defense would present.  Hearing Tr., at 438 (Dkt. No. 64).  Had there been collaboration between co-counsel, the eye-witness testimony could have merged with the defense's theory because Ms.

24

Gallagher's testimony would have supported it was Adam and not Mr. Zajac who planted the bomb. Counsel, therefore, has failed to provide a reasonable explanation about why this evidence was not developed and presented to the jury.

Notably, however, no library video surveillance has been presented to the court to show that Adam was at the library the day of the bombing. Likewise, there was no evidence that Adam was in Salt Lake City at the time of the bombing. In other words, nothing places Adam in Utah at the time of the bombing. In contrast, there was evidence placing Mr. Zajac here. Thus, even if this information had been presented to the jury, there is a reasonable probability the outcome of the trial would have remained the same.

Conrad Olsen was another witness who was present at the time of the bombing. He told Special Agent Minichino about a man who was seated for approximately 5 to 6 minutes in the relevant area. He described the man "as a heavy set white male wearing a green polo shirt and tan khaki pants," who was "approximately 5'10" and having a 'belly', approximately 30 to 50 years old, and with dark hair." Rpt. of Investigation (Pl.'s Ex. 7 in Case No. 2:12-cv-355). He further believed the man was "in possession of a black brief case." *Id.*

Special Agent Minichino found video footage of a man who appeared to match Mr. Olsen's description. *See* Photographs (Pl.'s Ex. 6A). Moreover, the video showed the man in the library during the relevant time frame. It further showed him carrying a white bag, entering the 2nd floor bathroom, then exiting seconds later. Aff'd for Arrest Warrant, ¶ 14 (Pl.'s Ex. 5). A few minutes later, it showed him entering the 3rd floor bathroom and then exiting seconds later "as [if] he had not found the location to be suitable for some purpose." *Id.* After Mr. Zajac's fingerprint was found, Special Agent Minichino initially thought the green-shirted man was Mr. Zajac. Thus, he used Mr. Olsen's description of the green-shirted man and the video of him to obtain an arrest warrant for Mr.

Zajac.

Presenting this information to the jury may have shown how video surveillance can be imprecise, thereby casting some doubt on the testimony of Sharon and Allison Zajac.  It also would have highlighted that witnesses saw two different men at separate times sitting in the relevant chair and both carried a white bag.  In contrast, there is no video of Mr. Zajac on the 3rd Floor.  Nor were there any witnesses who said they saw him by the chair or even on the 3rd Floor.

Other witnesses also provided accounts of a man sitting in or by the chair during the relevant time frame, and of hearing a hissing sound, which was relevant to identifying what type of fuse was used in the bomb.  Although defense counsel was not required to present every possible witness at trial, nor pursue every possible strategy, there is no information before the court to show defense counsel interviewed the witnesses.  Instead, during the § 2255 Hearing, Mr. Wall simply referred to looking at the library video surveillance and reading police reports about the witness statements.  *See* Hearing Tr., at 388 90, 392 93 (Dkt. No. 63).[13]

### 2.   *Cardstock with Mr. Zajac's fingerprint*

Mr. Zajac contends his counsel knew the cardstock with his fingerprint was not recovered from the crime scene, but they allowed the evidence to come in at trial.  Evidence presented at the § 2255 Hearing shows the cardstock was at the crime scene and that Mr. Zajac's assertion is incorrect.[14]

---

[13]   The Tenth Circuit Court of Appeals has stated, defense counsel has "an obligation to investigate carefully before setting out on a course of action."  *United States v. Barrett*, 797 F.3d 1207, 1229 (10th Cir. 2015) (addressing whether counsel was effective during the penalty phase).

[14]   Moreover, as discussed in paragraph 4 below, Mr. Zajac had admitted to counsel that the fingerprint on the cardstock was his.  He explained to counsel that he recalls seeing the cardstock and picking it up; then putting it in a hoodie of a homeless man as he passed by Mr. Zajac near the library.  This explanation makes it even less plausible that the government planted the evidence at a later date.

3.    *Post-trial and Appellate Counsel*

After the trial concluded, Mr. Zajac was appointed new post-trial counsel and then again new appellate counsel.  Mr. Zajac contends post-trial counsel and appellate counsel refused to raise the issues addressed in his § 2255 Motion, and that he was prejudiced as a result of it.  The court will address this issue below when it discusses the cumulative impact of the issues.

4.    *Misuse of Defense Strategy and Mitigating Evidence*

Mr. Zajac asserts his counsel were deficient when they ignored his position on the fingerprint evidence.  On October 30, 2009, Mr. Zajac sent a letter to Ms. Gorman informing her he was "opposed to any defense strategy that argues against my ownership of the fingerprint recovered from the Hobby Lobby cardstock."  Letter, (Dkt. No. 4, Part 3, Ex. G-1 in Case No. 2:12-cv-355).  Instead, he wanted his expert to discredit that his fingerprints were on the Hinsdale envelope.

On November 17, 2009, Mr. Zajac sent a second letter to Ms. Gorman about the fingerprint. He stated,

> This correspondence shall list my position as it pertains to ownership of a fingerprint.  I refer to that print recovered from the SLC library crime scene on September 15, 2006. . . .
>
> I recall having handled that cardstock.  This happened near the library at the time substantially before the IED event.
>
> As a result, I am opposed to any defense strategy that contradicts my association with this piece of evidence.
>
> I was in no way involved with the IED crime.  I had no knowledge of the pending IED crime, nor any suspicion of it.

*Id.* at Ex. G-2.  Thus, Mr. Zajac admitted the Salt Lake fingerprint was his, but denied that the fingerprints on the Hinsdale envelope were his.

Rather than stipulate about the fingerprint, Mr. Zajac contends the United States was allowed

27

to portray him as being "hunted down."  Mr. Zajac, in essence, was hunted down.  Investigators had

to search for a match to the print and then review the evidence known at the time before they arrested

Mr. Zajac in Illinois.  Even if his counsel had followed the strategy he wanted, these facts would not

have changed.

In place of following Mr. Zajac's strategy, defense counsel challenged the testimony of the

fingerprint experts at a *Daubert* hearing.  As a result, the court excluded some of the fingerprints on

the Hinsdale envelope and all of the testimony on individualization.  This minimized, to the degree

that it could, the remaining evidence on both the cardstock and the envelope.  Hearing Tr., at 399 02

(Dkt. No. 63).  Once that was done, Mr. Wall testified at the § 2255 Hearing "there was nothing more

that could have been done with regard to an expert to further limit or to change the jury's perception

regarding those points of congruity."  *Id.* at 402.  Thus, no expert was called by the defense at trial

to rebut the fingerprint evidence.

While defense counsel had an obligation to consult with their client about his defense, the

court concludes they did not prejudice Mr. Zajac by pursuing the alternative course.

5.      *Failure to Subpoena Witnesses*

Mr. Zajac contends that his counsel had no intent or ability to put on a defense because only

2 of their 29 listed witnesses were subpoenaed.  Of those 29, Sharon, Adam, and Allison Zajac were

called by the United States and were cross-examined by defense counsel.  Defense counsel also had

Dr. Frederic Whitehurst, William Tobin and Dr. William Eggington available to testify as experts.

Hearing Tr., at 437 (Dkt. No. 64).  Some of the other witnesses, including Patricia Gallagher, were

also identified by the United States and subpoenaed by them.  *See* Return of Service (Dkt. No. 398).

Thus, they were available at trial if necessary.

The court has already addressed the possible testimony of Ms. Gallagher above.  With respect

to the remaining witnesses, after the United States rested, the court sealed the courtroom for an ex

parte communication with defense counsel and Mr. Zajac.  Mr. Wall engaged in a colloquy with his

client on the record where Mr. Zajac acknowledged he was waiving his right to testify based on the

advice of counsel.  Trial Tr., at 1334  36 (Dkt. No. 551).  Mr. Wall then informed the court he had

discussed with Mr. Zajac,

> the effect of calling all of the various particular potential witnesses the
> defense might have, and based on that discussion, and with an
> understanding by Mr. Zajac as to the reasons for that, recognizing it is
> frankly a decision to be made by counsel as a strategy decision and
> having consulted with my client about that, it's our intention to not call
> any witnesses when the court resumes.

*Id.* at 1336.  Although Mr. Zajac did not state on the record he agreed about the witnesses not being

called, he also did not inform the court during the closed session that he opposed it.  In open court,

the defense then rested.

> 6.    *Use of Deception*

Mr. Zajac asserts his counsel used deception to get him to waive his right to testify and to not

pursue additional *Daubert* hearings.  Specifically, Mr. Zajac contends his counsel informed him they

would call witnesses and those witnesses would tell the story Mr. Zajac wanted to convey.

After the United States rested, the court allowed defense counsel to consult with their client

about whether he would testify.  After they consulted with him, the above colloquy took place on the

record.  Although not conclusive, it supports that Mr. Zajac knew witnesses were not going to be

called at the time he waived his right to testify.

Mr. Zajac has not provided sufficient information how his counsel deceived him into

foregoing additional *Daubert* hearings.  The court therefore does not address that allegation.

7.    *Use of Son as a Defense*

Mr. Zajac contends that he informed counsel he did not want to blame his son for the crime, but they wholly ignored him.  He states the entire defense cast him in the worst light and made him appear cowardly.  Mr. Zajac asserts he thought they intended to accuse his step-son of the crime because, unlike his son, he was in Nebraska and Utah during relevant time periods.  Additionally, he expected his counsel to call witnesses to show it was not Mr. Zajac who sat in the relevant chair and planted the bomb.

At the § 2255 Hearing, Mr. Wall testified that Mr. Zajac knew about a month before trial that the defense was going to focus on his son and he persisted in that course through trial.  Hearing Tr., at 391, 413  14 (Dkt. No. 63).  This aspect of the case is also troubling because there is a difference between a client knowing about a trial strategy and agreeing to a trial strategy.  The testimony at the § 2255 Hearing is unclear about whether Mr. Zajac agreed to the trial strategy or simply knew about it.  Moreover, other statements of counsel make this issue less clear.

The above colloquy correctly states that counsel has the right to make strategy decisions, but they do not have the right to present a defense contrary to their client's wishes.  "[I]t is the client who is the master of his or her own defense" and trial counsel only assists the defendant.  *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992) (quotations and citations omitted).  "The wisdom or unwisdom of the defendant's choice does not diminish his right to make it."  *Id.* (quotations and citation omitted).  Indeed, "[b]y exercising his constitutional right to the *assistance* of counsel, a defendant does not relinquish his right to set the parameters of that representation.  Any other conclusion would be 'to imprison a man in his privileges and call it the Constitution.'" *Id.* (quoting *Adams. v. United States ex rel. McCann*, 317 U.S. 269, 280 (1942)) (emphasis in original).

During the trial, Mr. Zajac's former wife testified that Adam and his father were close, they

remained close after Adam's wedding, and the got together regularly.  Trial Tr., at 866 67 (Dkt. No.

550).  She also testified that Mr. Zajac loved children.  *Id.* at 867.  Later, in a dramatic event, after

the verdict was read and the court thanked the jury for their service, Mr. Zajac stood up and stated to

the jury, "I apologize for my attorney accusing my son of the malicious lies he made upon him.  My

son had nothing to do with this whole thing.  He never did."  Hearing Tr., at 1501 (Dkt. No. 548).[15]

Mr. Zajac's love for his son and this event supports that Mr. Zajac did not agree to the defense and

was troubled by it.

At the § 2255 Hearing, Mr. Wall testified that he did not discuss all of the evidence or trial

strategy with Mr. Zajac because his client was disclosing information to his sister and filing

documents with the court that were affecting the strategy Mr. Wall was attempting to develop.

Hearing Tr., at 384 87, 415 (Dkt. No. 63).  Specifically, Mr. Wall testified he was disclosing

"strategic approaches or assessments that I had made of the case and had discussed with him and he

was acting contrary to the position that I wanted to take in the case so that I had a good strategic

position to try the case."  *Id.* at 385.  Thus, there is some indication that Mr. Zajac knew about part

of the trial strategy, but was not necessarily agreeing with it.

8.    *Prosecutorial Misconduct*

Mr. Zajac incorporates each of the twenty-six allegations of prosecutorial misconduct and

contends his counsel was ineffective for allowing such conduct.  The court has addressed each of the

allegations above and now addresses defense counsel's conduct in relation to them.

a.    Video surveillance from 13 cameras was lost.  Defense counsel objected

to this, but the objection was not pursued.

---

[15]   Trial counsel immediately moved to withdraw based on Mr. Zajac's comment, which the
court granted.  Trial Tr., at 1501 02 (Dkt. No. 548).

b.      The prosecution improperly argued that the fingerprint expert said the fingerprint characteristics applied to only one person and not any other.  Defense counsel did not object to this statement, but the reference was minimal when viewed in the context of the entire closing argument on fingerprints.

c.      The prosecution improperly argued that Mr. Zajac's fingerprint was found on the bomb.  Defense counsel did not object to this statement, nor did they correct it during their closing arguments.  It was an important distinction to make.

d.      The prosecution overstated what the two media witnesses said about Mr. Zajac's location on the day of the bombing.  Defense counsel did not object or clarify the statement.  One of the witnesses did testify he may have said he was there on the day of the bombing.  Thus, while the evidence was overstated, it was not a significant factor

e.      The prosecution incorrectly asserted the Allison Zajac identified her father, in part, based on his khaki pants.  Defense counsel did not object or clarify the statement, but the statement was minor in the context of Ms. Zajac's overall identification.

f.      The government spoliated the evidence about two briefcases found at Mr. Zajac's apartment.  The briefcase evidence was important because the blue-shirted man was seen carrying a black briefcase and Allison Zajac identified him based, in part, on the briefcase.  Additionally, the prosecution used photographs of Mr. Zajac's apartment to show he had black briefcases.  Defense counsel did not inform the court about the spoliation of evidence.

g.      The government spoliated the evidence about an envelope found at Mr. Zajac's apartment.  The envelope was important because it was used to connect Mr. Zajac to two threat letters.  Defense counsel objected to admitting photographs of the envelope on the basis the photographs were staged, the ink on the letters did not match, and therefore, admission would be

32

prejudicial. Defense counsel did not inform the court about the spoliation of evidence.

h.      The prosecution improperly stated during closing argument that Alliant Blue Dot powder was found in different locations in the home. Defense counsel did not object to this misstatement. Had they objected, however, the prosecution would simply have been more precise to state Alliant Blue Dot powder was found in a shop vac in Mr. Zajac's underground storage unit in Illinois. The connection to Mr. Zajac still would have been present.

i.      During opening statements, the prosecution misstated that a model rocket engine had been found at the Salt Lake bomb scene. Defense counsel did not object to this. Opening statement, however, are to state what the evidence will show. The evidence did not show what the prosecution said it would show and the mistake was not repeated during closing argument.

j.      During closing argument, the prosecution misrepresented that bomb experts had testified that a timer on a pipe bomb was unusual. This point was significant because it created an impression the two bombs were uniquely configured. Defense counsel did not object to this or clarify it during their closing argument.

k.      The government's expert testified the alligator clips at Mr. Zajac's apartment were visually consistent with those found at the bomb scenes. During cross-examination, however, defense counsel showed the expert's testimony was incorrect because there were visual inconsistencies.

l.      During closing argument, the prosecution misrepresented the batteries found at Mr. Zajac's apartment had identifying markings and lot numbers scraped off. This created a false impression to which defense counsel did not object or clarify.

m.      The United States' expert improperly modified her report to state the batteries in Mr. Zajac's apartment were heavy duty, alkaline 9-volt batteries. The prosecution then

33

implied the batteries at his apartment were the same as those at the bomb scenes.  Defense counsel did not object or clarify this false impression.

n.    The government spoliated the evidence of video footage of a parking lot outside the UPS store where the Hinsdale letter was mailed.  The video potentially had exculpatory information because it would have shown who entered the UPS store to mail the letter.  Defense counsel did raise this issue with the court for it to address how the Hinsdale letter should be treated in light of the spoliated evidence.

### 9.    *Allowing Perjured Testimony*

Mr. Zajac asserts his counsel was deficient when they allowed perjured testimony about the cardboard not being measured.  The court has addressed this allegation above and concludes his counsel acted properly regarding this testimony.

### 10.    *Failing to Present Evidence of Mr. Zajac's Visits*

As stated above, the evidence showed that Mr. Zajac traveled from Illinois to Utah at the time of the bombing.  Mr. Zajac contends correspondence from two individuals supported he was traveling to Arizona and California and those individuals would have testified about his anticipated visits.  The correspondence is vague as to time.  While the two individuals may have been able to testify why Mr. Zajac would be traveling to Utah, their testimony would not have explained why Mr. Zajac immediately returned from Utah rather than continuing in his travels.  Therefore, counsel acted reasonably in not presenting this evidence.

### 11.    *Failure to Maintain an Appropriate Relationship*

Mr. Zajac contends Ms. Gorman failed to maintain a proper professional relationship with him and instead made unwelcome overtures to him.  Mr. Zajac presented letters he had drafted to Ms. Gorman about her alleged conduct.  This allegation was not addressed at the § 2255 Hearing and the

34

court lacks any independent evidence to corroborate Mr. Zajac's allegations.  There is evidence in the record that Mr. Zajac asked for Ms. Gorman to be removed from his case, but Mr. Zajac has asked that for most, if not all, of the counsel that was appointed during the trial and post-trial stages of the case.  Accordingly, Mr. Zajac has failed to provide sufficient evidence to support this assertion.

## III.    IMPACT OF THE ERRORS

### A.    Excluding or Modifying the Evidence

The court has addressed above where errors have occurred in this case.  Some have greater significance than others.  When determining whether Mr. Zajac was prejudiced by these errors, the court considers the totality of the circumstances and to some degree must theorize about what would have happened absent these errors.  The court does not have to be certain the outcome would have been different; "it is sufficient if confidence in the outcome has been undermined." *Barrett*, 797 F.3d at 1229 (citation omitted).

The court first addresses the spoliation of evidence.  Although the government omitted footage from 13 cameras, the court would not have excluded the video clips of the blue-shirted suspect as a penalty for that spoliation.  That evidence therefore would have remained in the case.

Had the court been made aware of the conduct regarding the briefcases and envelope, those items of evidence would have been excluded.  The exclusion would have extended to any testimony by Allison Zajac identifying the blue-shirted man based upon his briefcase.  She would, however, have been allowed to testify based on other characteristics.

Had the court been made aware of the spoliation of evidence regarding the video of the parking lot outside the UPS store, the court would have excluded all evidence pertaining to the Hinsdale threat letter and the Hinsdale envelope.  As a result, there would have been no testimony about Mr. Zajac's fingerprints on the Hinsdale envelope.  Nor would there have been a comparative

letter introduced into evidence.

More significantly, the Hinsdale threat letter played a large role in determining whether the Hinsdale 404(b) evidence should be admitted in this case. The decision whether to admit such evidence was a close case. Had the court been aware about how the video was treated, the court would not have allowed in the Hinsdale 404(b) evidence, including the evidence of the cardboard matching the legal pad cut-out found in Mr. Zajac's apartment.

Next, the court assumes that an alternative defense theory should have been employed and evaluates its impact.[16] As discussed above, the witness accounts in this case were strong. There also was alternative footage of one suspect carrying a white bag who was acting suspiciously on the 2nd and 3rd floor of the library. Had the video footage and witness accounts been introduced, it would have been more difficult to explain why the blue-shirted man was not seen on the 3rd Floor and how it was that no one saw a man opening a briefcase and taking out a fast food bag from it.

Third, had the errors not occurred, the jury also would have understood that (1) Mr. Zajac's fingerprint was not found on the bomb, (2) Alliant Blue Dot powder was not found throughout Mr. Zajac's apartment, (3) the alligator clips did not match those found at the bomb scene, (4) the batteries did not match those found at the bomb scene and no identifying marks and lot numbers were scraped off, (5) none of the distinctive marks on the bombs corresponded to the tools found in Mr. Zajac's apartment,[17] and (6) having a timer on a pipe bomb was not unique.

The cumulative effect of excluding or modifying the above evidence is significant. This,

---

[16] By making this assumption, the court does not decide whether Mr. Zajac did or did not agree to use his son as a defense.

[17] As stated above, for the less distinct marks, the tools could neither be included nor excluded as possibly making those marks.

however, does not end the court's analysis.  It now must look at Mr. Zajac's third ground for relief and then at the overall impact on Mr. Zajac's trial.

###     B.     Third Ground for Relief

As stated above, Mr. Zajac's third ground for relief is based on his assertion that the United States failed to prove each element of the counts charged.  The court must view this ground in light of the evidence that would have remained had the above errors not been present.

####         1.     *Possession of the Destructive Device*

Mr. Zajac asserts the United States failed to prove he possessed a destructive or explosive device.  He notes that no destructive device was found at his apartment.  Mr. Zajac also argues that most of the components used to construct the Salt Lake bomb (such as Alliant Blue Dot powder and alkaline 9-volt batteries) also were not found at his apartment.  He further contends that the evidence failed to show Mr. Zajac was in possession of a destructive device as he traveled from Illinois to Salt Lake.  There was no search of his vehicle for trace evidence, no witnesses, no receipts showing the purchase of the components, and no tools used to construct them.

Although no destructive device was found at Mr. Zajac's apartment, Mr. Zajac's fingerprint was found among the Salt Lake City bomb remnants.  The Salt Lake City threat letter contained specific information about the bomb that had not been released to the public.  The threat letter was postmarked from Nebraska during the same period of Mr. Zajac's visit.  This provides strong evidence that Mr. Zajac possessed a bomb.

Moreover, other items in Mr. Zajac's apartment also support possession, such as (1) caulking or silicone on cardboard and batteries, suggesting experimentation on items similar to those used in

the bombing;[18] (2) Mr. Zajac's clothing that was similar in appearance to the blue-shirted man in the library video; and (3) tools that *may* have formed the toolmarks on the bomb components.  Further, the shop vac found in Mr. Zajac's storage unit had gunpowder consistent with Alliant Blue Dot powder, which is the same gunpowder used in the Salt Lake City bomb.

Finally, the cardstock, with the Hobby Lobby price tag and Mr. Zajac's fingerprint, had to have traveled through interstate commerce because there was no Hobby Lobby store in Utah at the time.  Cell phone tower data and a fuel receipt showed that Mr. Zajac traveled from Illinois to Utah and was present in Utah on the very day of the bombing.  When those facts are combined with the evidence found in Mr. Zajac's apartment and storage unit, the evidence was sufficient to show beyond a reasonable doubt the Mr. Zajac made the bomb in Illinois and that he possessed and transported it through interstate commerce.

### 2.   *Carrying or Use of a Destructive Device*

Mr. Zajac also asserts the evidence failed to show he carried or used a destructive or explosive device.  For this assertion, Mr. Zajac largely reargues the evidence about the blue-shirted man in the library surveillance video.  He also argues again about the fingerprint that was allegedly planted.  Sufficient evidence was provided to identify Mr. Zajac as the blue-shirted man, and the court has concluded Mr. Zajac's fingerprint was not planted.  Thus, the evidence supports, beyond a reasonable doubt, that Mr. Zajac carried or used a destructive device.

### 3.   *Willfully Mailing Threatening Letters*

Mr. Zajac also asserts the evidence failed to show he willfully used the mail to threaten the use of explosives.  Most of the evidence proving Mr. Zajac authored and mailed the Salt Lake City

---

[18] *Compare* Government's Exhibits 58, 67, 68, and 120 *with* Government's Exhibits 51, 52, and 121.

threat letter has been excluded.  As to the remaining evidence, Mr. Zajac argues the postmark for the Salt Lake threat letter did not match his travels and none of his computers showed he had drafted the letter.  The postmark indicates the letter was mailed from Omaha, Nebraska at 4:00 p.m. on October 23, 2006, which was a Monday.  *See* Envelope, at 8 (Dkt. No. 40 in Case No. 2:12-cv-355).  Mr. Zajac's daughter testified that Mr. Zajac had left Omaha, Nebraska the previous day.  *See* Trial Tr., at 848 49 (Dkt. No. 550).  Although Mr. Zajac left Nebraska on Sunday, it is reasonable to infer he dropped the letter in the mail late on Saturday or early on Sunday and that it was not postmarked until the next business day, namely, Monday.  The postmark therefore coincides with Mr. Zajac's visit to Nebraska. Moreover, the fact that his computers did not contain evidence of the threat letters does not disprove Mr. Zajac drafted them.  When this evidence is viewed cumulatively, there was sufficient evidence to prove beyond a reasonable doubt that Mr. Zajac willfully used the mail to send threatening letters about an explosive device.

### C.    Cumulative Effect on Overall Case

Although the remaining evidence was sufficient to prove each of the elements in the respective counts, Mr. Zajac contends the cumulative effect of the errors effectively denied him a fair trial.  As stated above, the errors in this case were significant.  Assuming all errors were excluded from the case, the jury would have heard the following evidence.

Mr. Zajac was close to his son and his son had a negative encounter with the police in Salt Lake City, Utah two years before the bombing.  Mr. Zajac had knowledge about electronics based on his employment.  Mr. Zajac traveled from Illinois to Utah and was in Utah on the day of the bombing.  These facts were shown by cell phone data records and a receipt at a gas station in Park City.  Additionally, Mr. Zajac's daughter and his former wife both identified the man wearing the blue-shirt

in the library video clip as being Mr. Zajac.[19]  The clip showed the blue-shirted man at the library during the relevant time frame.

Mr. Zajac's fingerprint was found on a piece of cardstock that was among the bomb remnants. That cardstock had a Hobby Lobby sticker on it and there was no Hobby Lobby store in Utah at that time.  There were Hobby Lobby stores in Illinois at the time of the bombing.  To believe the cardstock came from someone other than Mr. Zajac, one would have to believe someone else transported it from out-of-state and that it found its way to the library at the same time Mr. Zajac happened to be there.

Finally, a threat letter was mailed from Nebraska, which contained information about the Salt Lake City bomb that was unknown to the public at that time.  Mr. Zajac was in Nebraska at the time the threat letter was mailed.

The convergence of these facts is compelling.  Even if Mr. Zajac's counsel had presented witness accounts of the other men that were seen in the library during the relevant time frame, in the relevant chair, and carrying a white paper bag, none of that testimony would negate that Mr. Zajac also was at the library during the relevant time frame.  Nor would it negate that Mr. Zajac's fingerprint was found among the bomb remnants on a piece of cardstock that came from out-of-state. Additionally, it would not negate that Mr. Zajac happened to be in Nebraska at the time the threat letter was mailed.  Again, it is the convergence of these facts that is compelling.  Accordingly, despite the troubling errors that occurred in this case, the court concludes Mr. Zajac did not suffer prejudice

---

[19]  Mr. Zajac's sister was prepared to testify at trial that the video did not depict her brother. Affidavit (Gov't Ex. 201 in Case No. 2:12-cv-355).  The man in the video had a bald spot on the back of his head.  Mr. Zajac's sister submitted an affidavit for the § 2255 Hearing stating her brother did not have a bald spot in September 2006.  At most, his hair had started to recede, forming "widow's peaks."  Because Mr. Zajac's sister was in contact with him much more than his daughter or former wife, her testimony *may* have partially discredited the identification made by the other two individuals.  Defense counsel informed the court at the start of the trial, however, that they did not intend to call Mr. Zajac's sister as a witness.

(meaning the outcome would not have been different) due to them.  The court therefore denies Mr. Zajac's § 2255 Motion.

## V.  CERTIFICATE OF APPEALABILITY

Because the court has denied Mr. Zajac's § 2255 Motion, it must now address whether a certificate of appealability should be issued.  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This burden may be met when "reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *United States v. Tony*, 637 F.3d 1153, 1157 (10th Cir. 2011) (quotations, citation and alteration omitted).  As the court stated, there are a number of troubling issues that Mr. Zajac has raised.  Although closing arguments are not evidence, they are designed to persuade the jury to reach a particular conclusion.  When the arguments misstate important evidence that is the last thing a jury hears before beginning deliberation.  Such occurred here.

Additionally, the court has had rare experience where potential exculpatory evidence was mishandled or lost.  Yet, in this case that happened with possible DNA evidence, briefcases, an envelope, video surveillance from the library, and video surveillance of the parking lot at the UPS store.  Again, the court concludes these issues were insufficient to alter the outcome of the trial.  When combined with the misstatements during closing argument, however, a reasonable jurist may conclude otherwise.

Finally, although Mr. Zajac's counsel obviously put forward significant effort in his defense, the questions that remain about witness interviews and how the defense strategy was chosen are sufficient, when combined with the other issues, to warrant certification.

## <u>CONCLUSION</u>

For the reasons stated above, the court DENIES Mr. Zajac's § 2255 Motion (Dkt. No. 1), but

GRANTS a certificate of appealability.

DATED this 16th day of December, 2015.

BY THE COURT:

Clark Waddoups
United States District Judge